# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 08-1310

**STATE OF LOUISIANA**

**VERSUS**

**MARILYN ROMAN LIVELY**

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 03-458
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and James T. Genovese, Judges.

**CONVICTION AFFIRMED.**

**J. Phillip Haney**
**District Attorney**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**Counsel for Appellee:**
**State of Louisiana**

**Mark Owen Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**Counsel for Defendant/Appellant:**
**Marilyn Roman Lively**

**Jeffrey J. Trosclair**
**Sixteenth Judicial District Court**
**500 Main Street, 5th Floor**
**Franklin, LA 70538**
**(337) 828-4100**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**EZELL, JUDGE.**

The Defendant, Marilyn Roman Lively, was charged by bill of indictment filed on March 20, 2003, with first degree murder, a violation of La.R.S. 14:30. The State sought the death penalty in this matter. The Defendant entered a plea of not guilty on April 17, 2003. A "Motion to Change Plea of 'Not Guilty' to 'Not Guilty and Not Guilty by Reason of Insanity'" was filed on April 11, 2007. The motion was granted on May 17, 2007. The State then requested a sanity commission, and the trial court ordered that a commission be formed. The Defendant subsequently entered a plea of not guilty by reason of insanity. On September 6, 2007, the trial court found the Defendant had the capacity to proceed, and there was no evidence of a mental infirmity at the time of the commission of the offense.

Following a five-day trial which commenced on October 19, 2007, a jury found the Defendant guilty of first degree murder. During the penalty phase, the trial court declared a hung jury. The Defendant was subsequently sentenced on January 29, 2008, to life imprisonment without benefit of probation, parole, or suspension of sentence.

A motion for appeal was filed and granted on January 29, 2008. The Defendant is now before this court asserting one assignment of error. Therein, the Defendant contends the evidence was insufficient to support her conviction.

**FACTS**

The Victim, Jermasha "Manny" Decuir, and her younger brother, Dean, were sent to live with the Defendant and her children, Perez and LaShawn, by their mother, Netravon "Netra" Sam. While in the Defendant's care, Jermasha died. Jermasha was five years old at the time of her death and had lived with the Defendant since she was two-and-a-half or three years old.

1

## ASSIGNMENT OF ERROR

In her only assignment of error, the Defendant contends the evidence was insufficient to convict her of first degree murder.

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal*, 2000-0674 p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La. R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal*, 2000-0674 p. 9, 796 So.2d at 657.

*State v. Draughn*, 05-1825, p. 7 (La. 1/17/07), 950 So.2d 583, 592, *cert. denied*, __ U.S. __, 128 S.Ct. 537 (2007).

The Defendant was convicted of first degree murder. First degree murder is the killing of a human being "[w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve[.]" La.R.S. 14:30(A)(5). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *Draughn*, 950 So.2d at 592-93. Additionally, specific intent "may be formed in an instant." *State v. Wright*, 01-322, p. 11 (La. 12/4/02), 834 So.2d 974, 984, *cert. denied*, 540 U.S. 833, 124 S.Ct. 82 (2003).

Dr. Susan Garcia was accepted as an expert in forensic pathology. Dr. Garcia performed an autopsy on Jermasha on January 30, 2003. Dr. Garcia testified that

Jermasha was thirty-eight inches tall and weighed twenty-seven pounds. Thus, she was beneath the fifth percentile for both height and weight for her age. Dr. Garcia testified that Jermasha's stomach contained "5 cc's of brown liquid lining the stomach wall." Dr. Garcia further testified there was no food or any type of material in the stomach, very little watery fluid in the small bowel, and no fecal material in the colon. Dr. Garcia opined that these findings indicated Jermasha had not eaten in six to eight hours.

Dr. Garcia examined Jermasha's body and testified that the only external area of the body that did not show evidence of injury was the genital region. Dr. Garcia testified that Jermasha had recent bruising to the forehead and scalp. There were lacerations to the front and back of the head, which were the result of blunt force trauma, that were in the process of healing. She also had linear marks on the buttocks that were consistent with a grill from an electric stove. The injuries to the buttocks were healing and were less than thirty days old. Jermasha also had burn injuries to both her hands. These injuries occurred prior to the time of death and were consistent with the hands being forced into and held in hot liquid. The injuries were in the process of healing.

Dr. Garcia further testified that Jermasha had bruising and a laceration to the soft portion of the upper lip. The left front middle tooth was missing as a result of that injury. However, there was no injury to the outer portion of the lip. Dr. Garcia testified that this indicated the front of Jermasha's face, especially around the upper jaw, had been forcefully pushed against a hard object. As a result of trying to move away from the object, Jermasha cut the inside portion of her lip on the tooth. Dr. Garcia testified that these injuries occurred at the time of death.

3

Jermasha was pronounced dead on January 30, 2003, at 10:00 a.m. Dr. Garcia did not make a determination regarding the time of death. Dr. Garcia testified that asphyxia due to suffocation was the cause of death. Dr. Garcia further testified that suffocation was a result of the inability to move oxygen through the nose or mouth caused by a consistent pressure covering that area. Dr. Garcia opined that it would take three to five minutes without oxygen for brain damage to occur and that a person was more likely to die after five to ten minutes without oxygen.

Jimmy Dupuis, a paramedic, responded to the residence of the Defendant's mother on January 30, 2003, at 9:15 a.m. When Dupuis entered the home, he saw the Defendant holding a child who was wrapped in a blanket. Dupuis took the child and placed her on a couch. The child was ice cold to the touch, which indicated she was dead. Dupuis placed the child on a heart monitor, which "flat-lined." The child exhibited lividity, which is a pooling of the blood on the back of her arms. Dupuis opined that the child had been dead for longer than an hour.

Paul Duplantis was qualified as an expert in the field of "Emergency Medical Technician and Death Investigators." As part of his job as death investigator with the coroner's office, Duplantis responded to the residence of the Defendant's mother on January 30, 2003, at 10:00 a.m. Duplantis testified that Jermasha's body was cold but still pliable, and there was lividity to the back.

Duplantis reviewed several photographs that were admitted into evidence at trial. He pointed to a small laceration on Jermasha's head, a bruise to the left temporal area, bruising to the eye, bruising to the shoulder, froth coming from the mouth, bruising to the rib area, a laceration to the gums, a missing tooth, a puncture to the shoulder, a laceration to the back of the head, burn marks to the buttocks, bruising to the lower legs, and skin sluffing from the toes on both feet.

4

Duplantis testified that the injuries to Jermasha's eye, lip, and gums, the missing tooth, and the puncture to the shoulder occurred within twenty-four hours of her death. However, he could not determine if the injuries occurred at the time of death.

Detective Adisak Thammavong interviewed the Defendant on January 30, 2003. During the interview, the Defendant indicated that on January 29, 2003, she put Jermasha and Dean out to play at 1:30 p.m., and she waxed the floors. Later, Jermasha asked for milk and the Defendant left her and Dean in the kitchen and she went to her bedroom to fold clothes. At that time, the Defendant was cooking gumbo. She subsequently discovered Jermasha eating salt from the box. The Defendant then punished Jermasha.

The Defendant's daughter LaShawn's track practice ended at 4:00 p.m. or a little after. She picked up LaShawn then Tina, her other daughter, and dropped them both off at Domino's for work. She returned home at approximately 4:45 p.m.

Jermasha urinated on herself on the way to Domino's. When they got home, the Defendant gave Jermasha clean clothes, but she refused to change. A little after 5:00 p.m., the Defendant called Jermasha's mother, Netra, because Jermasha would not change clothes. Jermasha said she was cold, and Netra told her to change clothes, which she did. Jermasha then asked for milk.

Between 5:00 and 6:00 p.m., the Defendant's neighbor Joyce brought mail to her that had improperly been delivered to Joyce's home. The Defendant left Jermasha and Dean inside the house and went outside to get the mail. While speaking to Joyce, the Defendant told Joyce that Jermasha had been stealing and putting her head in the toilet. Therefore, the Defendant planned to give Jermasha back to her mother in February. As the Defendant spoke to Joyce, Dean came to the door and said, "come

5

see." The Defendant went back inside her residence and found Jermasha with her head in toilet and feet up in the air. The Defendant also said Jermasha's feet were against the toilet. The Defendant indicated Jermasha was not moving at that time. The Defendant also indicated that when she took Jermasha's head out of toilet, Jermasha was fighting with her, and she bit the Defendant's finger.

Once the Defendant got Jermasha out of the toilet, she laid Jermasha on the floor and hit her face in an attempt to rouse her. The Defendant also said Jermasha stood up, but her eyes were closed. The Defendant asserted she was worried because there may have been ammonia in the toilet, as she had cleaned the toilet earlier in the day and did not remember if she had flushed the toilet after cleaning it.

After the Defendant struck Jermasha, Jermasha vomited clear water. She then opened her eyes. The Defendant gave her a cloth to clean up with and went to get clean clothes for her. Jermasha took a bath, and the Defendant washed her hair. Jermasha then got dressed for bed. The Defendant asserted she did not have to perform CPR on Jermasha.

The Defendant further asserted that Jermasha walked out of the bathroom and asked for a glass of milk. Jermasha then ate her dinner and drank milk, which she had gotten from Joyce. Jermasha said she was tired and laid down on a pad on the floor. The Defendant asserted that her son Perez came home later that evening, between 6:30 and 7:30 p.m., and he looked at Jermasha. The Defendant further stated that LaShawn got home from work at approximately 8:30 p.m., and Jermasha was laying down and breathing normally at that time.

Around 2:30 or 3:00 a.m., Jermasha went to the bathroom and asked for milk, which the Defendant gave her. At 6:00 a.m., the Defendant woke her older children for school and Jermasha was breathing at that time. At 7:30 a.m., Jermasha got up

6

and asked for milk, which she drank, but she did not want to eat breakfast. The Defendant then got Jermasha's clothes and helped her get dressed. Jermasha then laid back down. Between 8:00 and 9:00 a.m., Jermasha was gaging for breath, and the Defendant phoned her mother. The Defendant's mother suggested that the Defendant pick up Tina, the Defendant's daughter, and go to the hospital, as she recalled how long it took the ambulance to arrive when the Defendant had a stroke. The Defendant subsequently took Jermasha, who was breathing at that time, to the car. The Defendant stated Jermasha was not breathing by the time they got to her mother's house. The Defendant also said she picked up Tina and drove as far as the carwash before Tina said Jermasha was not breathing. When Tina said this, they turned around and went back to the home of the Defendant's mother. As a result, Tina then called 911 and was told to have the Defendant perform mouth to mouth resuscitation on Jermasha. The Defendant stated it was not normal for Jermasha to stick her head in the toilet, but it was not the first time she had done so.

The Defendant informed police that she took Dean and Jermasha from Netra because she was on drugs. The Defendant said that on the day she took Dean, he was inside Netra's apartment alone and crying, and Netra was outside smoking marijuana. The Defendant took Dean, and Netra never came to get him. Three months later, Netra asked if she wanted Jermasha.

The Defendant said Jermasha had burns to her hands because the child put her hands in a pot of meat while the Defendant was outside. This occurred the week of Christmas. The Defendant further stated that Jermasha had blisters on her hands as a result of putting them in the pot. When she bathed, Jermasha peeled the skin off her hands. The Defendant asserted Jermasha did not cry when she injured her hands. The Defendant did not take Jermasha to the doctor, and said she did not tell anyone

7

she had done so. However, she consulted a pharmacist who told her to buy antibiotic ointment to treat the burns.

As a result of the burns, one of Jermasha's fingernails was missing. The Defendant asserted Jermasha's hands were red because they were healing. She further asserted that although Jermasha's hands were injured, she closed her fists and played outside. The Defendant asserted that Jermasha's left hand looked worse after she stuck her head in the toilet.

The Defendant asserted that Jermasha's foot was burned at the time Netra gave Jermasha to her. The Defendant also said the burns to Jermasha's buttocks were present when Jermasha came to live with her.

The Defendant told police that Jermasha bruised her side when the Defendant was trying to get her out of the toilet. She contended she did not see any bruises on Jermasha when she gave Jermasha a bath the previous day. The Defendant also told police that Jermasha's tooth fell out while she was playing in the yard on January 29, 2003, and she gave the Defendant the tooth, which the Defendant wrapped in a paper towel and put on the kitchen counter. The Defendant did not know how Jermasha's lip got split, and she did not look at Jermasha's gums when Jermasha gave her the tooth. The Defendant also did not see a laceration on Jermasha's head.

The Defendant asserted she had to lock up everything, including the pantry, because Jermasha would steal. She would even put cooked food in the pantry or in her bedroom so Jermasha would not steal it. Jermasha also stole from the rooms of the Defendant's children. The Defendant stated that once when returning from the hospital at 3:00 a.m., she found Jermasha eating raw corn meal. Jermasha also stole things from the trash, including rice, chicken skin, and pizza crust and ate them. Jermasha also stole orange juice and hid it in drawers and in her pants. The

8

Defendant never took Jermasha to the doctor to see why she stole food. When Jermasha stole, the Defendant would not give her snacks and would put her on her knees.

The Defendant denied beating Jermasha. The Defendant asserted she spanked Jermasha twice with her hand on the legs. She said she had no paddle in the house and did not hit Jermasha with an orange piece of plastic found inside her residence. She would put Jermasha on her knees when she did something wrong. The Defendant asserted Jermasha was bad, but she never cried.

The Defendant contended Jermasha once went to daycare, but the owner did not want her there because she would steal and defecate in her clothes and wipe it all over. The Defendant also asserted that Netra would not pay for daycare.

The Defendant asserted her kids lied if they said they hated Jermasha for stealing. However, the Defendant later said Perez did not like Jermasha because of what she did, but he would not hurt her. She further asserted her kids did not hit Jermasha. However, they could have done so when she was not at home. She then stated LaShawn would "tap" Jermasha, but did not hurt her. The Defendant informed police that she would tell them if her kids had hit Jermasha.

The Defendant made a video of Jermasha putting her head in the toilet. She did this because she was going to send Jermasha home and wanted Netra to see what Jermasha was doing.

The Defendant asserted Netra sent Jermasha a doll for her birthday. Jermasha was born on Netra's birthday, January twenty-eighth. On that day, the Defendant brought Netra gumbo, and Netra was having a drug party. The police told the Defendant that Netra said the Defendant did not bring Jermasha because she said Jermasha had diarrhea. The Defendant denied this.

9

The Defendant said that bloody paper towels found in the residence contained Dean's blood, as he had had a bloody nose. The Defendant did not remember if Jermasha bled.

Detective Chad Gaudet testified that he interviewed the Defendant at 8:36 p.m. on January 30, 2003. During that interview, the Defendant stated that Netra called and asked the Defendant if she wanted Jermasha because she could not deal with Jermasha. The Defendant indicated she said yes because she wanted to raise Jermasha with her brother, Dean.

The Defendant said Jermasha was a hand full. She defecated on herself when she went to live with the Defendant. Jermasha had also started urinating on herself, which she quit doing a month or two after moving in with the Defendant. The Defendant then discussed things that Netra bought Jermasha and what the Defendant and her kids bought Jermasha. The Defendant contended that Jermasha urinated on herself at Christmas because Netra had given Dean more toys than she did Jermasha.

The Defendant asserted Jermasha started putting her hands in pots about two-and-a-half years ago. The Defendant then explained how Jermasha burnt her hands the week of Christmas and how the Defendant treated the burns. The Defendant again told police that Jermasha dug in the trash and ate food she found there.

The Defendant again explained the events that occurred on January 29, 2003. The Defendant also told police that the owner of the daycare spanked Jermasha a couple of times. The Defendant further stated that the owner called her to say Jermasha had taken another child's banana and that Jermasha disrupted other kids while they slept.

The Defendant said Jermasha had put her head in the toilet twice, once when the Defendant videotaped her and the day before she died. The Defendant videotaped

10

Jermasha drinking from the toilet and stealing doughnuts to show Netra. The Defendant showed the tape to her cousin Dexter. She did not remember when the tape was made, but it was some time after Jermasha's hands were burnt.

The Defendant stated she began to lock the bedrooms and pantry in November to keep Jermasha out of things. The Defendant said she punished Jermasha for stealing by putting her on her knees, and she whipped her twice, and her daughter whipped her twice. The Defendant denied whipping Jermasha with a stick, a boat paddle, a belt, and an orange plastic piece. She asserted a spatula found in her closet was old and that she used it to dig in flower beds.

The Defendant said she was sending Jermasha home in February, and she had given Netra two weeks' notice. The Defendant was also going to send Dean home because it was time for Netra to start acting like a mother. The Defendant claimed that she had previously said that when Perez was in the tenth grade it would be time to send Jermasha and Dean home. Additionally, Netra was getting ready to send Jermasha to school.

Dexter Latulas, the Defendant's first cousin, testified at trial. He stated that he saw Jermasha and the Defendant at the home of the Defendant's brother around Christmas of 2002. The Defendant showed him Jermasha's burnt hands and said Jermasha tried to put her hands in a hot pot of stew to get a piece of meat.

After the first of the year, Latulas went to the Defendant's home because he did not believe Jermasha had put her hands in a pot. Latulas testified that during the visit, Jermasha was standing, her whole body was shaking, her hands were partially bandaged, and there was blood on the floor. Latulas guessed the blood had dripped from Jermasha's hands. He testified that Jermasha appeared to be getting weak. He further testified that she appeared to have been standing in the same spot for a while.

11

While Latulas was at the residence, the Defendant sent Jermasha to change clothes. Latulas testified that Jermasha walked away from the spot she had been standing in and had one shoulder higher than the other. The Defendant then hit Jermasha on the left shoulder and said, "Bitch, walk better than that." Jermasha screamed in response and did not appear to change the way she was walking. Latulas testified that the Defendant subsequently said, "I'm gonna end up killing that lil' bitch[.]" Latulas further testified that he asked the Defendant what was wrong, and the Defendant said she was trying to break Jermasha from doing weird things. Jermasha returned with clothes, and the Defendant changed her shirt and pants. Jermasha then went to stand in the same spot she had been in earlier. Jermasha never moved from that spot for the remainder of Latulas' visit. Latulas testified that he was at the residence for three to four hours.

On the same day, the Defendant showed Latulas a videotape of the weird things Jermasha was doing. There was no audio on the tape. However, Latulas saw Jermasha standing in front of a closet which contained numerous Little Debbie pies and cakes. The Defendant stated she had videotaped Jermasha stealing from the closet. He next saw Jermasha standing in the bathroom and putting her head in the toilet. Latulas testified that it appeared that someone was telling Jermasha what to do on the video. Latulas came to the conclusion that Jermasha was being abused. Latulas testified that when he left the residence, Jermasha was reaching toward him telling him she wanted to go with him.

Latulas testified that he contacted police a few days later. Latulas did not remember if he told police the Defendant said she would end up killing Jermasha. However, he did tell police they needed to go to the home or "they was going to kill her." Latulas then testified that the Defendant made the statement that she would kill

12

Jermasha, but he was not sure if it was before or after he saw the video. At a previous hearing, he testified that he told police about the Defendant's statement. He had not previously mentioned that Jermasha was shaking.

Deputy Darren Bourque responded to a call by Dexter Latulas in January of 2003. Latulas informed him that a child had burns from touching a hot pot, and he was suspicious about the circumstances of the injuries. Deputy Bourque generated a police report regarding Latulas' complaint. Deputy Bourque testified that Latulas did not state on what date he saw the injuries. However, he did say he had just returned from the house. Deputy Bourque further testified that Latulas did not tell police his cousin would kill the child.

Deputy Bourque attempted to locate the address of the residence but could not. Therefore, he forwarded the information to the juvenile investigator. Bourque's report was dated January 10, 2003.

Kevin Kately was working as a detective on January 30, 2003. He took a statement from the Defendant on February 1, 2003.

During the interview, the Defendant said she was covering up for someone and again told police how she came about getting Dean. She then explained that Netra scalded Jermasha with hot water and then put alcohol on the burns. As a result, Jermasha had to be rushed to the hospital. Netra subsequently called the Defendant and told her to come get Jermasha. The Defendant proceeded to discuss Netra's inability to care for Dean and Jermasha.

The Defendant again informed police that Jermasha had problems defecating on herself and spreading it around and that Jermasha put her hands in pots. The Defendant then explained that when Jermasha misbehaved she would take the child

13

to Netra's house, and Netra would abuse her. As a result of the abuse, Jermasha stopped defecating on herself and started urinating on herself.

The Defendant further told police that Netra made the marks on Jermasha's buttocks with a hot plate in June or July. Netra said, "the bitch should have been dead" when the Defendant called to ask what happened. The Defendant again explained how Jermasha burned her hands, what she used to treat the burns, and how Jermasha would peel the skin from the blisters.

The Defendant explained the events that occurred on January 29, 2003. Many of the details regarding what transpired that day are the same as those set forth by the Defendant in her previous interviews. However, the Defendant did state that Perez called from school between 6:00 and 6:30 p.m. and that, once he was home, he spoke to Jermasha.

The Defendant then asserted that her boyfriend, Roosevelt Peter, Jr. came over to her residence after Perez was home. Roosevelt played with Dean then went to Rite Aid because he had cut his finger. While Roosevelt was there, Jermasha asked to lie down, and Roosevelt said she looked tired. Before leaving, Roosevelt asked if he could come back for sex. The Defendant said she told him she would think about it.

LaShawn called about 8:10 p.m. because she and Tina needed a ride home from work. The Defendant beeped Roosevelt, who then called her. She requested that he pick up LaShawn and Tina from work and bring them home, which he did. When Roosevelt dropped LaShawn off, he stayed in his car, and the Defendant went outside to talk to him. Roosevelt said he was going to get something to eat and to pick up candy for his wife, then he would return.

At almost 9:00 p.m., Roosevelt returned. At that time, Dean came out to play with Roosevelt, and Jermasha was resting. Roosevelt and the Defendant

14

subsequently went to her bedroom. LaShawn was in the bathroom, so the Defendant could not get a wet towel Roosevelt wanted before they had sex. Therefore, Roosevelt got mad and left.

After Roosevelt left, Perez watched part of a movie, LaShawn was not feeling well, and Jermasha was laying down. The Defendant ate, read the newspaper, watched television, and then laid down. Around 2:00 a.m., Jermasha went to the bathroom. After 3:00 a.m., the Defendant laid back down. Jermasha turned toward her, and the Defendant noticed that Jermasha had thrown up oatmeal or something else. The Defendant cleaned up the pad Jermasha was laying on and, at that time, Jermasha opened her eyes and was still breathing.

The Defendant said she laid back down. Subsequently, Jermasha was snoring then grinding her teeth, and the Defendant told her to stop. The Defendant later looked at Jermasha's little finger, and it was bleeding. The Defendant tapped the finger, and Jermasha moved her hand.

The Defendant got up again at 5:00 or 5:30 a.m. in anticipation of Roosevelt's usual morning visit. However, he did not stop by that day. The Defendant again explained how she got her children off to school, and, later that morning, Jermasha was having trouble breathing. The Defendant then attempted to drive Jermasha to the hospital. During this interview, the Defendant admitted that she was the sole caretaker for Jermasha on Wednesday, January 29, 2003.

The Defendant again discussed Dean's nose bleed and told police that sometimes Jermasha's hands would bleed. The Defendant then told police that one day Jermasha and Dean were wrestling, and Dean hit Jermasha in the head with an object. As a result, there was blood on Jermasha's shirt. This may have occurred a

15

week prior to Jermasha's death. The Defendant also asserted that Dean would pull Jermasha's hair. The Defendant again denied beating Jermasha.

During the portion of the interview found on State's Exhibit 84, the Defendant began to explain what happened to Jermasha. That portion of the DVD is inaudible. After the inaudible portion of the DVD, police asked the Defendant what happened, saying "what did he do to that child." The Defendant explained that Roosevelt came over before Perez got home, and he complained because she had stopped going out to do things with him because Jermasha was living at her residence.

The Defendant asserted that she did not know what happened in the bathroom. When Roosevelt left the bathroom and the Defendant went in, Jermasha's head was in the toilet, and blood was on the wall. The Defendant further asserted that she grabbed Jermasha and carried her in her arms and tried to give her CPR. Jermasha threw up oatmeal at that time. She took Jermasha to the living room and changed her clothes. There was blood on the wall and the floor inside the bathroom, which the Defendant cleaned up. Jermasha was bleeding from the head, and her hands were swollen.

The Defendant said she could not pick Perez up after his basketball game because she was cleaning up. She further said that Perez was telling the truth when he said Jermasha was wrapped up and not moving when he got home.

The Defendant said she called Roosevelt to pick up LaShawn and Tina. When Roosevelt dropped LaShawn off at home, he said he was going to get something to eat. This occurred after 8:00 p.m. Roosevelt returned and complained that there was always a hold up when he came over to have sex with her. He threw water on her, and the two of them argued. The Defendant asserted that Roosevelt shoved her and

16

complained about her taking care of kids. He then left and did not stop by or call the next morning, which he usually did.

The Defendant alleged she did not see Roosevelt go in the bathroom. The Defendant claimed she never did CPR on Jermasha, although she was barely breathing when Perez came in. The Defendant claimed Roosevelt told her it was her house so "they" would come after her.

The Defendant again explained that at 2:30 a.m. she took Jermasha to the bathroom. Jermasha threw up oatmeal and milk at 3:00 or 4:00 a.m. and was breathing slowly.

Marquitina "Tina" Lively, the Defendant's daughter, testified that she lived with her grandmother, with whom she had resided since she was twelve years old. On January 29, 2003, she was working at Domino's. She was scheduled to be at work at 5:00 p.m., and her mother took her. Jermasha, Dean, and LaShawn were also in the car. Jermasha was sitting on the floor in the back of the car. She was alive, but did not speak to anyone. She had a cut "behind her head" that day. Tina testified that Roosevelt picked her up when she got off work at 8:00 p.m. and dropped her off at home by 8:30 p.m.

The following morning, January 30, 2003, the Defendant called and asked Tina to go with her and Jermasha to the hospital. The Defendant stated Jermasha stuck her head in the toilet, and she was not breathing. The Defendant subsequently blew the horn, and Tina went outside to meet her. Tina testified that Dean and Jermasha were in the car with the Defendant. As they drove, the Defendant asked Tina to see if Jermasha was breathing. Jermasha was not breathing, so the group returned to Tina's house. Tina thought Jermasha was dead.

17

Once at the house, the Defendant took Jermasha out of the car and told Tina to call 911. The Defendant gave Jermasha mouth-to-mouth resuscitation, and Jermasha threw up. The Defendant then sat on the sofa with Jermasha in her lap. At a previous hearing, Tina said Jermasha coughed. Tina read from her statement to police, as follows: "She was coughing like and my mom give her mouth to mouth to bring her back, but some threw-up came out of her mouth."

Tina testified that she had seen the Defendant whip Jermasha when Jermasha urinated on herself. The Defendant told Tina that she whipped Jermasha for stealing food. Tina also saw Jermasha's hands, and the Defendant said Jermasha stuck them in a hot pot of meat.

Tina testified that the Defendant said Jermasha could not return to daycare because she put feces on the walls. The Defendant showed Tina a video tape, which had no audio, of Jermasha. Tina described what was on the video as follows: "She got to the toilet, she kept looking. She didn't put her head all the -- like in the toilet. She just turned her head the other way." Tina thought the video looked like someone was telling Jermasha to put her head in the toilet, but she would not do so.

LaShawn Lively, the Defendant's daughter, lived with her in January 2003. LaShawn testified that on January 29, 2003, her mother picked her up after school and brought her to work at Domino's. Jermasha, Dean, and Tina were with the Defendant, and Jermasha spoke to her at that time.

LaShawn testified that after work, Roosevelt picked up her and Tina. Tina was dropped off at her grandmother's home, and Roosevelt brought her to the Defendant's house. After LaShawn got home, she saw Jermasha covered up on a pad on the floor, and she was still on the pad when LaShawn left for school the next morning at approximately 6:20 a.m.

18

LaShawn testified that she had seen the Defendant strike Jermasha less than ten times. When she did strike Jermasha, the Defendant used a slipper, a belt, her hands, and an orange plastic object. LaShawn further testified that at the time Jermasha came to live at her house, Jermasha had burn scars on her legs, but not her buttocks. LaShawn indicated there were no special locks on the pantries at the Defendant's residence.

Perez Lively, the Defendant's son, lived with his mother in January 2003. Perez testified that he did not see Jermasha on the morning of January 29, 2003. After his basketball game that day, he called home at approximately 6:30 p.m. to have the Defendant pick him up. She told him she was doing something, and he needed to have someone else bring him home.

Perez testified that when he got home, the door was locked, and it took the Defendant a "minute or longer" to come to the door. Once inside, Perez went to his room, changed clothes, then went to the kitchen, and heated a bowl of gumbo. Perez then left the kitchen and saw Jermasha on the Defendant's lap. The Defendant was giving her mouth to mouth. Perez then told the Defendant she could not blame it on Netra. Perez testified that he made this comment because Jermasha had injuries to her foot at the time she came to live with the Defendant. The Defendant then said "she didn't know if [Jermasha] stuck her head in the toilet, or if she put chemicals in the toilet." The Defendant also told Perez she was not taking the blame and did not want to go to jail. Perez subsequently threw his gumbo away and went to his room.

Perez testified that he came out his room later, and Jermasha was covered up on a pad in front of the television. She was not moving at that time. Perez did not see Jermasha move, talk, or breath. He admitted that he assumed Jermasha was not breathing.

19

Later, while Perez was on the computer, Roosevelt came over, but did not stay long. Roosevelt subsequently brought LaShawn home from work, and he came in again. Perez testified that Roosevelt was at their residence for a short period of time and then left. Perez further testified that after LaShawn came home, he spoke to her in her room and told her something did not feel right.

The next morning Perez woke up at 6:30 a.m. He tried to go to the bathroom, but the Defendant told him "that man was in the bathroom." He then returned to his room and got dressed. He subsequently went to the bathroom and left for school. On the school bus, Perez told LaShawn that "it didn't feel right" and [s]omething "funning"[sic] was going to happen to the Defendant, Jermasha, or Dean. Perez never told LaShawn he saw the Defendant giving Jermasha mouth to mouth.

Perez testified that he had seen the Defendant hit Jermasha. This began to happen when Jermasha started drinking from the toilet and stealing food. Perez testified that when Jermasha stole food, the Defendant would get mad, take the food away, and whip her. Because Jermasha stole food, locks were put on the pantry. Jermasha also stole food from a small refrigerator Perez had in his bedroom.

Perez testified that he saw the Defendant give Jermasha severe whippings about every day. As a result, Jermasha would urinate on herself. The Defendant struck Jermasha with her hands, fists, and a plastic toy depicted in State's Exhibit 80. Perez would go to his room during these events. Perez testified that the Defendant punished him in the same manner.

Perez further testified that he returned from football practice in 2002, and Jermasha's hands were wrapped. Jermasha told him she put her hands in a hot pot of meat. The Defendant told Perez she had taken Jermasha to the doctor.

Perez remembered Latulas being at his home in January 2003. Perez testified that on that day, Jermasha was on her knees by the door. Jermasha left that area because her hands were bleeding, and the Defendant told her to get something to clean up the blood. Jermasha was walking slowly, so the Defendant hit her on the shoulder with a plastic object. Jermasha then cleaned up the blood and got back on her knees. She was on her knees for more than two hours.

Perez testified that Jermasha had previously gone to daycare. The Defendant told him Jermasha quit going because she put feces on the wall of the daycare center.

Joyce Joseph, the Defendant's neighbor, testified that she had a letter in her mailbox for the Defendant on January 29, 2003. Joyce rang the Defendant's doorbell, the Defendant answered, and she gave the Defendant her mail. During their conversation, the Defendant told Joyce that Jermasha stole, lied, and burned her hands in a pot of stew. The conversation was interrupted by a little boy who came to the Defendant's door. The child was yelling, "mama" and pointing at something. The Defendant then left.

Joyce testified that night at approximately 7:15 or 7:30 p.m., the Defendant came to her home and asked for milk. Joyce further testified that the Defendant said she needed the milk because she wanted to eat a piece of cornbread. Joyce gave the Defendant the milk she requested, and the Defendant left. Joyce further testified that she heard the car at the Defendant's house starting "[a]fter 7:00 or something like that."

Henrietta Broussard operated a daycare that Jermasha had once attended. Henrietta testified that Jermasha began attending daycare in August 2001. On the first day Jermasha was at daycare, Henrietta accompanied Jermasha to the bathroom

21

and noticed scratches on her back, which she documented. Henrietta brought the scratches to the Defendant's attention.

Henrietta further testified that Jermasha attended daycare for approximately a week and a few days and did not return. The Defendant told Henrietta she could not afford to send Jermasha to daycare. Henrietta asserted that she never told the Defendant that Jermasha could not return because she wiped feces on the wall.

Roosevelt "Duke" Peter, Jr., testified that the Defendant was his mistress in January 2003.[1] He stopped by the Defendant's house on his way to work on January 29, 2003, between 5:15 and 5:30 a.m. On that day, Roosevelt saw Jermasha. However, he did not recall if she was up and moving around. Roosevelt testified that he worked that day from 6:00 a.m. until 4:30 p.m.[2] After work, he brought a co-worker home. Roosevelt got home at approximately 5:00 p.m. He then began cutting his son's hair between 5:15 and 5:20 p.m. Roosevelt's cousin, Eugene Joseph, came over between 5:00 and 6:00 p.m. He subsequently left with Eugene and helped him install an air conditioner, during which Roosevelt cut his finger. Roosevelt then returned home, finished cutting his son's hair, cleaned himself up, and left.

Roosevelt testified that he then went to the Defendant's house. At that time, Perez was on the computer, and Jermasha was covered up on the floor in front of the sofa taking a nap. Roosevelt testified that he was in the residence for five to ten minutes and did not see Jermasha move. He then left and went to the drug store.

While Roosevelt was at the drugstore, the Defendant contacted him and asked him to pick up her daughters from work. Roosevelt complied with the request. Roosevelt testified that when he dropped LaShawn off, he did not get out of the car.

---

[1]The witness's last name is spelled Peters and Peter in the record.

[2]Roosevelt's time card was admitted as State's Exhibit 91. The time card indicated he worked on Wednesday from 5:59 until 4:30.

However, the Defendant approached his car and asked if he was going to return. Roosevelt then went to Exxon and Chevron.[3]

Roosevelt subsequently returned to the Defendant's residence, and the two went to the Defendant's bedroom, as they planned to have sex. However, they did not. Roosevelt testified that he did not see any children while he was in the house. Roosevelt further testified that the Defendant did not want him to leave. She then blocked the door, and he had to physically move her.[4] He turned over the clothes he wore that night to police and provided them with DNA samples.

Roosevelt testified that he saw injuries to Jermasha's hands. The Defendant told him Jermasha tried "to steal meat out of the pot, so she burned her hands." The Defendant told him she brought Jermasha to the doctor. The Defendant also complained that Jermasha was stealing food and "using it on herself."

The Defendant sent a letter to Roosevelt, which was admitted as State's Exhibit 93. The letter was postmarked April 14, 2003, and read as follows:

> Duke, nothing wrong. Just a short letter. Look, before I start, let me say that I'm sorry for what I put you through.
>
> Those detectives kept on putting your name in there.
>
> Please forgive me. I never could tell you about how I felt about you. But I did love you and I also know that I would never have you for myself.
>
> What I need to tell you, keep your wife. Because when you lose something you love, it hurts real bad. I know, because I lost everything. Children, parent, brothers, sister.
>
> Take care - - my word on that, please. Turn your life around. Be there for your wife. There's nothing out there. Tell her how much you love her.

---

[3]State's Exhibit 24 contains video surveillance of Roosevelt at one of the stores. The time on the video was 21:34:03, and that time was off by one hour.

[4]Roosevelt testified that he had previously been convicted of a simple battery involving the Defendant.

Believe me, I'm so tired. Looks like things is getting harder each day. There is one thing I need to ask of you. Please, every once in a while check on my children. Kind of be there for Perez. He don't have a father. Now it look like he won't have a mother. Talk with him. Do things with him, please. You was like a father for him and my girls. I will - - (Not audible) - -

Well, I am closing this letter. Remember what I said.

Love you from my heart. Always will, no matter what.

Take care of yourself and those kids.

Marilyn Lively.

Denise Peter testified that on January 29, 2003, her husband, Roosevelt Peter, Jr., returned home from work between 4:45 and 5:00 p.m.[5] Roosevelt subsequently cut their son's hair. Eugene Joseph came over between 5:30 and 6:00 p.m., and her husband left with him and returned after fifteen to twenty minutes. While Roosevelt was helping Eugene, he cut himself. Denise testified that Roosevelt left home again at approximately 7:00 p.m. and returned at 9:10 or 9:15 p.m. and remained home through the next morning.

Eugene Joseph testified that Roosevelt assisted him with an air conditioner between 6:00 and 7:00 p.m. During the installation, Roosevelt cut his finger. Once the job was complete, Eugene brought Roosevelt back home.

Scott Hotard, a former employee of the Iberia Parish Sheriff's Office, interviewed the Defendant on January 31, 2003. He interviewed her again on February 2, 2003. During the interview, the Defendant told police Roosevelt made her feel like she was guilty because Jermasha's death occurred in her home. She said she should have told police the truth from the beginning. She could not say what the time of death was.

---

[5]The witness's last name is spelled Peter and Peters in the record.

24

The Defendant told police that Perez got home between 7:00 and 7:30 p.m. and the incident involving Jermasha took place before Perez got home. The Defendant asserted that a little after 6:00 p.m. Roosevelt came over to her residence, and he had an attitude. The Defendant would not have sex with Roosevelt because Jermasha was up. Dean came into the kitchen and told her to come see. She went into the bathroom and saw Jermasha's head in the toilet and Roosevelt's right hand on top of Jermasha's head. The Defendant asked Roosevelt what he was doing, and he shoved her, causing her to hit the door. She said she was not lying, and she was tired of covering up for Roosevelt, who was an abusive person.

The Defendant said Roosevelt told her he cut his finger at work. When he was leaving her residence, he told her he was going to buy bandages. The Defendant asserted that when Roosevelt arrived at her residence he did not have a bandage on his finger, but he did when he left. The Defendant further asserted that when Roosevelt left, there was blood on the toilet seat, the floor, the tub, and the shower door. She picked up Jermasha and rocked her. Jermasha was breathing, and her eyes were open. However, Jermasha did not say anything.

The Defendant asserted she wanted to find out what happened, so she beeped Roosevelt. Roosevelt brought LaShawn home but did not get out. She went to the car, and he said he did not have time for her. He was still "pissed off." The Defendant said she told Roosevelt that if he would get out, she would have sex with him. He said he had to go across the street to get candy for his wife and to get something to eat.

Roosevelt returned to the Defendant's house at 8:30 or 8:45 p.m. The two went into her bedroom, and she asked him what happened. He went into a rage and shoved

25

her on the bed and threw water on her. He went outside and left after ten or fifteen minutes. This occurred before 9:00 p.m.

The Defendant stated that when she picked Jermasha up out of the toilet, Jermasha's teeth hit her causing a scrape to the Defendant's hand. The Defendant further stated that she grabbed Jermasha and gave her CPR in the Defendant's bedroom. She did not remember if Roosevelt had blood on him.

The Defendant asserted she would never hurt Jermasha. She informed police that Roosevelt had been arrested twice. She stated that when they argued he would grab her jaw and hold it tightly. The Defendant then asserted that a week prior to Jermasha's death, Jermasha put her head in the toilet, and Roosevelt told her if she did it again he would whip her.

Hotard also interviewed the Defendant again on February 4, 2003. During the interview, the Defendant explained that the events at issue got kicked off on Tuesday, January 28, 2003, because Jermasha had gotten into Roosevelt's fried chicken, and he "went off." Roosevelt had Jermasha by the arm whipping her with a piece of plastic, and Jermasha was hollering. The Defendant indicated that Roosevelt hit Jermasha in the area of her shoulder. The Defendant gave him five dollars and told him to leave.

Roosevelt came over Wednesday, a little after 6:00 p.m., which was before Perez called for a ride. The Defendant asserted that Jermasha's head injuries must have occurred when Roosevelt shoved Jermasha's head in the toilet. She got Jermasha out of the toilet, slapped her face a couple of times, and cleaned her up. Jermasha then asked for milk. The Defendant put her on the bed after Roosevelt left. The Defendant said she had blood on the front of her own shirt. Jermasha's hair was

26

wet and dripping, and the Defendant cleaned her up. Jermasha did not talk, but her eyes were moving and she was breathing.

The Defendant then explained what happened when Perez called home and that Roosevelt picked her daughters up from work. Roosevelt did not get out when he dropped LaShawn off at home but came back later. At that time, she confronted him, and Roosevelt told her she should send Jermasha and Dean home and stormed out of the house.

The Defendant then explained her version of the events that occurred on January 29, 2003, again. She also discussed the injuries to Jermasha's hands again.

Hotard testified that a conversation between Roosevelt and the Defendant that occurred on February 5, 2003, had been recorded. During that conversation, the Defendant said she knew what happened and asked Roosevelt where his shirt was. Roosevelt told the Defendant she was trying to "put me in some bull sh__." Roosevelt then stated that Perez was home when he arrived at the Defendant's residence. The Defendant continued to ask Roosevelt where his shirt was, and Roosevelt hung up on her.

Hotard interviewed the Defendant again on February 7, 2003. During that interview, the Defendant discussed Roosevelt's clothes. She informed police that they seized the wrong clothes. The Defendant then said she had to nail Roosevelt.

The Defendant told police she lied because the incident occurred at her house. She then said she knew how to get to Roosevelt. The Defendant wanted to get him to talk about the blood on his clothes and the injury to his hand. The Defendant then told police that Roosevelt bought all his clothes in twos and that police had gotten the wrong shirt from Roosevelt.

27

The Defendant explained that she had been with Roosevelt for nine years, that his family knew about their relationship, and the family told Roosevelt's wife that Roosevelt and the Defendant were cousins.

Hotard interviewed the Defendant again on February 8, 2003. During that interview, the Defendant asserted Jermasha put her hands in Roosevelt's chicken on January 28, 2003, and he whipped her.

Police then showed the Defendant the orange object found at her home and a spatula that they thought had blood on it. Police then put out photos of Jermasha and asked the Defendant about the "grill." The Defendant told police that Jermasha's mother burned the child's buttocks.

The Defendant again explained that she saw Roosevelt with his hand on Jermasha's head, which was in the toilet. The Defendant did not know how Jermasha received an injury to her head, as she washed and braided Jermasha's hair on Tuesday and did not see the injury. The Defendant admitted that her clothes had blood on them, and police questioned how it was that Jermasha did not have blood on her when she was found. The Defendant then asserted that the gash on Jermasha's head happened on Tuesday the twenty-eighth, and, when Roosevelt shoved her head in the toilet, it started bleeding again. The Defendant then said she saw the gash on Tuesday after Roosevelt whipped Jermasha with the orange plastic object. Defendant also said there was blood in the living room.

The Defendant further informed police that she left Jermasha home one day with Perez's friend while she dropped Tina off at work. Jermasha was sitting with her head down when the Defendant returned home. A few days later, LaShawn caught Jermasha in her bag of cookies and "gave her a lick." Later, there was blood on the pillow, but the Defendant did not remember what day this occurred.

28

The Defendant further stated that Jermasha was in the car crying and said LaShawn hit her. The Defendant dropped LaShawn off, and, once home, she noticed that Jermasha's shirt had blood on it. The Defendant used peroxide and neosporin to clean Jermasha, then braided her hair. Later, Jermasha did something else, and LaShawn hit her again. LaShawn had a graduation ring and other rings on when she hit Jermasha, and she also used the orange plastic piece. The Defendant did not remember what date this occurred.

The Defendant told police that on another occasion LaShawn hit Jermasha because Jermasha had been in LaShawn's room touching her things. The Defendant further asserted that one time Jermasha had a knot on her head. Additionally, the Defendant's children got to the point that they did not want to be around Jermasha. The Defendant told police that Perez would not interact with Jermasha, and LaShawn did not want Jermasha to sleep in her bed. Additionally, Dean would pull Jermasha's hair and hit her in the head with a toy truck.

The Defendant explained Wednesday's events again. She also discussed how Jermasha burnt her hands.

Hotard testified that the stove burners retrieved from the Defendant's residence were a perfect match to the injuries on Jermasha's buttocks. He also investigated Roosevelt Peter, Jr., who was very cooperative. Hotard investigated whether Roosevelt went to Rite Aid and made a purchase there. Hotard found that Roosevelt had purchased bandages at 8:05 p.m. on January 29, 2003.

Hotard further testified that phone records revealed a call to the Defendant's residence from Westgate High School, which Perez attended, at 6:30 p.m. Someone got on the internet at 7:09 and 7:23 p.m. There was a call by the Defendant to Domino's at 7:50 p.m. There was a one minute call from the Defendant's residence

29

to Roosevelt's cell phone at 7:53 p.m. Additionally, someone was on the internet again at 7:54 p.m. There were no calls to Domino's after that time.

The parties stipulated that the Defendant left her home at approximately 8:30 or 9:00 a.m. on January 30, 2003, and did not return through February 15, 2003. The parties further stipulated that a letter found in the Defendant's residence was written by her. The letter read as follows:

> "LaShawn and Perez, don't look for me. Everything will be all right. Writing to tell you that I love you and you will always be in my heart. Please read this letter good and do just what I say to do. Return the computer and desk back to Rentway. Those two freezers, freeze, washer machine, Play Station II, in my room go to Affordable.
>
> Let Ashley and Tina know that I love them and you stay on the right track. One of you need to pick up my check from Fremin on February 7th and don't forget to get the five hundred from Kendrall. My check from Van's Kiddy Care, also. Take that and put everything in a storage. Don't worry, I know I should have been send Manny home but I was tried to work with her. After everything she did, I just didn't want her to go home. But now, I am so sorry that I didn't send her home. I just turned our family home -- I just turned our family good home to nothing. If everything turn out okay I will never take another child in my home again."

Hotard admitted that when police told the Defendant the time of death was between 6:00 and 9:00 p.m. on January 29, 2003, they were not providing her with information that was correct. Additionally, information that Jermasha died from a blow to the head was incorrect.

George Schiro, an employee of the Acadiana Crime Lab who was qualified as an expert in DNA analysis and blood stain pattern analysis, performed tests on evidence recovered in this case. He testified that Jermasha's blood was found on the toilet, the toilet plunger, the left side of the vanity cabinet, the bathroom door, the bathroom wall, the bathroom trash can, the right and left sides of the hallway, and the living room couch.

30

Schiro further testified that sweat pants found in the master bedroom tested positive for Jermasha's blood. Another stain on the pants contained a mixed DNA profile. Schiro could not confirm the presence of blood. The DNA profile confirmed that Jermasha was the major contributor of the stain and the minor contributor was a male that did not match the DNA profile of Perez, Roosevelt, or Dean. Two human blood stains were found on a T-shirt found in the master bedroom. Both blood stains came from Jermasha. A spatula found in the closet of the master bedroom did not test positive for blood. Jermasha was the major contributor of DNA on the spatula, and the Defendant was the minor contributor. An orange piece of plastic also had Jermasha's blood on it.

Testing was done on a white Toyota Camry. Blood found on the back of the driver's seat contained a mixed DNA profile. The major contributor was Jermasha, and the minor contributor was an unknown male. The rear passenger seat had a "swipe" of blood that came from Jermasha. Schiro testified that the swipe had a paintbrush quality which indicated it could have been from bloody hair rubbing across the door.

Blood found on the bathroom vanity cabinet was in a vertical drip pattern, meaning blood was dripping down from the source. Blood found on the bathroom wall was medium velocity impact spatter. The point of origin occurred in the bathroom from the vanity to the bathtub. Schiro testified that this type of blood spatter was associated with stabbings, beatings, and/or sudden movements of a bloody object or body part.

In brief to this court, the Defendant asserts the first weakness in the State's case was the medical evidence. The Defendant contends the State failed to prove

when Jermasha died, as neither the coroner nor the doctor performing the autopsy made a determination of the time of death.

The Defendant further contends the State failed to prove how the mouth injury proved intentional suffocation. The Defendant asserts that although Dr. Garcia testified that the mouth injury occurred at the time of the suffocation, she did not negate the reasonable hypothesis that the injury and resulting suffocation was an accident. The Defendant notes that in *State v. Clark*, 97-359 (La.App. 4 Cir. 11/12/97), 703 So.2d 131, *writ granted*, 97-3184 (La. 4/24/98), 717 So.2d 1165, *on remand*, 97-359 (La.App. 4 Cir. 10/7/98), 720 So.2d 134, *writ denied*, 99-330 (La. 6/18/99), 745 So.2d 617,[6] Dr. Garcia made the same diagnosis - that an internal cut on the lip by a tooth indicated that the injury had occurred during suffocation. The Defendant asserts that in *Clark*, the manslaughter conviction was affirmed because other evidence established the suffocation was not accidental.

In *Clark*, the defendant was charged with first degree murder. The jury found him guilty of manslaughter. The defendant asserts the manslaughter conviction was affirmed because the defendant told someone he thought he killed his mother, the bedroom showed clear signs of a struggle, and the defendant's blood was on the victim. The court found that even if the evidence could not negate an intentional suffocation, it still supported a manslaughter conviction since it occurred during the commission of a battery.

---

[6]The case was remanded in accordance with *State v. Jyles*, 96-2669 (La. 12/12/97), 704 So.2d 241, in which the supreme court stated that in an *Anders* brief, counsel must review not only the procedural history of the case and the evidence presented at trial but must also provide a detailed and reviewable assessment for both the defendant and the appellate court of whether the appeal is worth pursuing in the first place.

The Defendant further contends the State failed to prove Jermasha was being starved. The Defendant points out that Dr. Garcia found that Jermasha was underweight and had not eaten within six to eight hours of her death. Dr. Garcia also testified that she performed tests to preclude the existence of disease, but the State never asked Dr. Garcia about the results of those tests. The Defendant further asserts that without a time of death, it would be impossible to determine if the fact that Jermasha had not eaten within six to eight hours of her death was relevant.

The Defendant further points out that much was made of the fact that Jermasha had numerous scars and burns on her body that were over thirty days old. The Defendant notes that Dr. Garcia could not determine when the old injuries were sustained. The Defendant further notes that nothing links her to those injuries. The Defendant then asserts that testimony established that when Jermasha came to live with her, Jermasha already had numerous scars and burns on her body.

The Defendant next points out that Dr. Garcia documented cuts, bruises, and burns to Jermasha's body that occurred "prior to thirty days." The Defendant asserts that, except for the burned hands, Dr. Garcia was never asked whether any of the injuries could have been accidental. "As a consequence, the reasonable possibility that some of these injuries were accidental, cannot be excluded."

The Defendant asserts the second weakness in the State's case is the testimony from lay witnesses. The Defendant contends the State failed to ask questions of the lay witnesses that could have excluded the reasonable hypothesis that she was innocent. The Defendant further contends there was no question that Jermasha was abused by someone. Yet, nothing linked her to the abuse.

The Defendant asserts that no witness testified about seeing her inflict any injuries upon Jermasha. Additionally, no witness was asked about seeing burns on

33

Jermasha's buttocks. The Defendant asserts the State relies on the caretaker argument that since she was the child's caretaker, only she could have caused the various injuries, including the fatal injury. The Defendant then cites *Wright*, 834 So.2d 974, in which she contends the caretaker argument was upheld in the first degree murder of a five-year-old child because the defendant told police he was watching the victim twenty-four hours a day, and this claim was supported by family and neighbors.

The Defendant asserts there was nothing adduced to show that only she was alone with Jermasha when "the injuries occurred." The Defendant further asserts that none of the lay witnesses were asked any questions to establish that she was the only person that could have inflicted the physical abuse upon Jermasha. The Defendant contends that it is noteworthy that none of the witnesses were asked if they had inflicted any of the abuse. The Defendant asserts that if the State is going to single out one family member and accuse her of a pattern of abuse, the State "obviously has to give the jury some evidence that it could use to exclude everyone else."

The Defendant asserts that without a time of death or evidence that could allow a jury to exclude all other persons as sources of the abuse, she cannot be convicted merely because she was Jermasha's caretaker. She further asserts that the fact that she gave conflicting statements does not prove she harmed Jermasha.

The Defendant then asserts the record shows that she functions at a borderline mental retardation level, and there is a high probability that she suffers from a brain dysfunction, particularly in the executive functioning area of the prefrontal lobe.[7] She asserts this could cause inappropriate responses to stressful situations. Thus, the State failed to prove that her conflicting statements establish her guilt.

---

[7]We note that evidence regarding the Defendant's mental functioning was presented during the penalty phase.

We submit the Defendant's assertion that the State failed to prove the time of death is correct. However, time of death is not an element of the offense of first degree murder and need not be proven by the State. *See* La.R.S. 14:30.

The Defendant also asserts that Dr. Garcia did not rule out the possibility that the injury to Jermasha's mouth and resulting suffocation were accidental. Dr. Garcia testified that Jermasha had bruising and a laceration to the soft portion of the upper lip, and the left front middle tooth was missing as a result of that injury. However, there was no injury to the outer portion of the lip. Dr. Garcia testified that this indicated the front of Jermasha's face, especially around the upper jaw, had been forcefully pushed against a hard object. As a result of trying to move away from the object, Jermasha cut the inside portion of her lip on the tooth. Dr. Garcia testified that these injuries occurred at the time of death. Dr. Garcia further testified that it would take consistent pressure covering the area of the mouth and nose for five to ten minutes for death to occur.

Based on Dr. Garcia's testimony that Jermasha's face was forcefully pushed against a hard object and that she was deprived of oxygen for five to ten minutes, we find that the State proved Jermasha's death was not accidental and that the person who committed the act had the specific intent to kill or inflict great bodily harm.

The Defendant asserts the State did not prove Jermasha was being starved. We find that evidence regarding starvation or whether Jermasha had eaten within six to eight hours of her death was not relevant to prove any element of first degree murder. Thus, whether Jermasha had an illness that would explain her weight is not necessary to a determination of the sufficiency of the evidence in this case.

We find that testimony regarding old and new injuries to Jermasha's body and who inflicted those injuries are not relevant to a determination of sufficiency of the

35

evidence in this case. The only injuries relevant to a sufficiency review are those that occurred at the time of death.

The Defendant asserts the State did not ask nor prove she was the only person who could have injured and killed Jermasha. In her numerous statements to police, the Defendant asserted Jermasha put her own head in the toilet and that Roosevelt forced Jermasha's head in the toilet while, she, Jermasha, and Dean were at home. Testimony indicates that Perez was at a basketball game, LaShawn was at work, and Dean was younger than Jermasha. Thus, a jury could reasonably conclude that the Defendant or Roosevelt pushed Jermasha's head into the toilet on January 29, 2003.

The Defendant asserted that Roosevelt came to her residence before Perez got home, and he came home between 6:00 and 7:30 p.m. Roosevelt got off work at 4:30 p.m., and his wife testified that he got home between 4:45 and 5:00 p.m. Roosevelt then left home with Eugene and assisted him in installing an air conditioner. He then returned home and left. Based on this testimony, Roosevelt left home to help with the air conditioner between 5:00 and 7:00 p.m. His wife testified that after he returned home from installing the air conditioner, he left home again at 7:00 p.m. The jury's verdict indicates it chose to believe the testimony concerning Roosevelt's whereabouts, along with Perez's testimony that he saw the Defendant performing CPR on Jermasha after he got home from the basketball game, which was between 6:00 and 7:30 p.m. on January 29, 2003.

Based on the testimony presented by the State, the only people at the Defendant's home during the time the Defendant asserts Jermasha's head was in the toilet were Jermasha, Dean, and the Defendant.

The following morning, when the Defendant asserts Jermasha was gagging for her breath, the only people home were the Defendant, Jermasha, and Dean, as

36

LaShawn and Perez had already left for school, and Roosevelt did not stop by the house that morning. We find that the jury would not believe that Jermasha forced her own head in the toilet (or against another hard object) with such force as to knock out a tooth and bust her lip nor would they believe that she could leave her head against that object for five to ten minutes with sufficient force to cause her own death. Additionally, a jury would not believe this act was performed by Dean, a child under the age of five.

Based on the evidence presented, the State proved that the Defendant was Jermasha's sole caretaker during the times which Jermasha's head was in the toilet and when she was gagging for breath. Additionally, the State proved the Defendant had the specific intent to kill or inflict great bodily harm, as it took five to ten minutes for Jermasha to die. The State further proved that Jermasha was under the age of twelve at the time of her death. Accordingly, the Defendant's conviction is affirmed.

## CONCLUSION

The Defendant's conviction is affirmed.

**CONVICTION AFFIRMED.**